UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
07-CV-1642(JMR/FLN)

Charles O. Ihekoronye      )
                           )
        v.                 )          ORDER
                           )
The City of Northfield,    )
Minnesota, et al.          )
                           )

Plaintiff in this action was charged with a crime. The charges were dropped when another suspect was discovered. Plaintiff seeks damages from those responsible for initially investigating the crime. Defendants deny liability, and move to dismiss or for summary judgment. Defendants' motions are granted.

Plaintiff worked at the Northfield Care Center ("Northfield Care"), a nursing home in Northfield, Minnesota. He lost his job on June 1, 2003. Shortly afterward, one of the nursing home residents, a 76-year-old woman, described a sexual assault. The search for her assailant focused on plaintiff, who was investigated, arrested, criminally charged, and detained. More than two months later, the prosecutor dropped all charges when it came to light that the nursing home had employed two men of similar appearance, and the victim could not positively identify her assailant.

Plaintiff seeks redress for the time he spent in jail and the time he was removed from the nursing assistant registry. Defendants include the nursing home and its employees, the City of Northfield and its police officers, and the Minnesota Department of

Health and its special investigator.  All defendants move to
dismiss, or alternatively, for summary judgment.  Because the Court
considers material outside the pleadings, it considers the matter
as one for summary judgment pursuant to Rules 12(d) and 56 of the
Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  Defendants'
motions are granted.

I.  Background[1]

Plaintiff was a nursing assistant who had been placed at
Northfield Care by a temporary staffing agency.  On June 1, 2003,
after staff complaints of sexual harassment, Northfield Care
informed the staffing agency it would no longer employ plaintiff.

One week later, a 76-year-old Northfield Care resident with
multiple sclerosis spoke to Nicole Benjamin, a nursing assistant.
The resident said she had been sexually assaulted by a male nurse
who came into her room at night to change her incontinence pads.
Ms. Benjamin, who is not a defendant, did not report this
conversation.  She told the resident, instead, to report the
incident to social services, and to turn on her night-light when
staff came into the room.  She later told police the resident said
the assaults had occurred "months" earlier, and the resident "had

---

[1]Plaintiff has submitted no facts in response to defendants'
motions, but relies on the unverified allegations contained in his
Amended Complaint.  For purposes of these motions, the Court views
the facts in the light most favorable to plaintiff, the non-moving
party, and assumes the facts alleged in the Amended Complaint to be
true, except where directly contradicted by defendants' evidence.

no idea" who assaulted her "because it was so dark."[2]  Affidavit of Rich Bailey ["Bailey Aff."], ¶ 6.

On June 16, 2003, the resident described the assault to a different nurse who was conducting a pelvic examination.  This nurse informed Karen Turner, a licensed practical nurse who served as the facility coordinator.  The report triggered Minnesota's Vulnerable Adults Reporting Act ("VARA"), Minn. Stat. §§ 626.557-5572 (2002).  Acting in accord with VARA, Ms. Turner interviewed the resident, accompanied by Sara Tromsness, a licensed social worker.  Both Ms. Turner and Ms. Tromsness are defendants in this case.  The interview lasted from 5:35 to 7:15 p.m.  Tromsness took notes of Turner's questions and the resident's replies.

In response to Ms. Turner's questioning, the resident said she had been assaulted at least twice, each time between 11:00 p.m. and midnight.  She recalled that one assault took place on a Sunday.  She described her assailant as a "shorter" black man who had taken care of her "a few times."  She said it had been too dark to see his face, but she did not recall him having facial hair.  She said he wore a "shorter white coat/jacket".  Although the assailant

---

[2]Plaintiff alleges Ms. Benjamin suggested his name to the victim at this time.  The sole support for this inference appears to be a statement in Ms. Turner's report that the victim "said that she thinks she knows him after talking to Nicole [Benjamin]."  See Declaration of Karen Turner, Ex. A. ["Turner Report"] at 4.  The Court considers that, even if Ms. Benjamin did offer plaintiff's name, that fact would afford no basis to find liability on the part of any defendant here.

spoke to her, the resident did not recognize his voice and could not remember if he had an accent.

The resident said her assailant had been at a baby shower for another staff member named Owusu, and that he had five daughters and recently had a son. Turner asked the victim, "Can you think of any names that may or may not have done this?" After thinking through a number of staff members' names, both silently and aloud,[3] the victim identified plaintiff by name - "Charles!" Turner asked, "It was Charles?" The victim replied, "Yes." Turner prepared a written report of the interview. See Declaration of Karen Turner ["Turner Decl."] Ex. A ["Turner Report"] at 4.

Following the interview, Ms. Turner first notified the resident's family, then called Northfield police. Officer Rich Bailey responded to the nursing home later that night. He began his own investigation by speaking to Ms. Turner, who told him of her interview with the victim, including the victim's effort to identify the assailant. Turner described the victim as "mentally sharp" but with "short-term memory problems." Bailey Aff. ¶ 3. Officer Bailey interviewed the victim again, with Turner present.

Turner's report reflects that the resident "told Officer Bailey the same information" as before, but "didn't go into as full

---

[3] Plaintiff alleges Turner and Tromsness suggested names. Compl. ¶ 27. This allegation is contradicted by the record, which makes clear the victim thought of names on her own. See Turner Report at 4.

detail." Turner Report at 5.  The resident told Officer Bailey she was not sure of the assailant's skin color, but he wore a short white uniform jacket.  She also reported previously telling Ms. Benjamin of the assaults.  Bailey Aff. ¶¶ 1-4.

Ms. Turner gave Officer Bailey a copy of her report the next day.  She spoke to him again on June 18, confirming details of her original interview.  She complied with VARA by sending a Vulnerable Adult Maltreatment Report to Rice County, the "common entry point" designated by VARA.  Minn. Stat. § 626.557 subd. 9.  The County forwarded the report to Northfield police and the Minnesota Department of Health.  With this submission, Northfield Care Center's role in the investigation ended on June 18, 2003.

Northfield police continued their investigation.  Officer Bailey called Ms. Benjamin, who described her conversation with the resident.  Sergeant Monte Nelson of the investigative division reviewed Bailey's report and the maltreatment report.  Sergeant Nelson spoke to an official at the Minnesota Department of Health ("MDH"), the administrative agency VARA designates to lead nursing home maltreatment investigations.  Minn. Stat. §§ 626.5572 subd. 13(a); 626.557 subd. 9c.  The official said the MDH would take the lead in the investigation.  MDH Special Investigator Debora Vangsness, of the Office of Health Facility Complaints, was assigned to do so.  The Northfield police turned their investigative file over to the state with no determination of

probable cause or recommendation as to charges, and without arresting plaintiff. Affidavit of Monte Nelson ["Nelson Aff."] ¶ 9, Bailey Aff. ¶ 9; Affidavit of Roger Schroeder ["Schroeder Aff."] ¶ 4. The Northfield police concluded their investigation on July 1, 2003. Schroeder Aff., ¶¶ 3-4.

Meanwhile, Vangsness began her work on June 23. She interviewed the resident on June 25, with police and family present. The resident said she was assaulted three times by a "short, black man" wearing a "white jacket." Declaration of Debora Vangsness ["Vangsness Decl."] ¶ 5, Ex. B ["Vangsness Report"] at 6. All three assaults occurred after 10:30 p.m., while it was dark and the resident was not wearing her glasses. The resident "couldn't remember" if the assailant's voice was deep, or if he had an accent, or any other identifying characteristics. Id.

According to the staff, plaintiff was the only person who fit the resident's description. Schroeder Aff. ¶ 2. Vangsness reached the same conclusion after reviewing staffing records. Vangsness Decl. ¶ 6. Vangsness also reviewed all previous facility staff and police investigations. She conducted additional interviews over the next few weeks with family members, other facility staff, the staff at the temporary agency which placed plaintiff at Northfield Care, and a psychologist who treated the resident. None of the witnesses expressed any doubt as to the resident's credibility or recall.

Vangsness subpoenaed plaintiff by mail.  Plaintiff signed the subpoena's certified mail receipt, but did not respond or appear for an interview.  From this signature, she concluded he received the subpoena and was aware of the investigation but chose not to participate.  Vangsness Report at 7.

On September 8, 2003, Vangsness filed a VARA-mandated final determination of maltreatment.  Vangsness Report; Minn. Stat. § 626.557 subd. 9c(b).  Applying a preponderance of the evidence standard, she found the resident's complaint was substantiated, and determined plaintiff had committed three separate acts of sexual abuse.  As required by VARA, the report was copied to the state board of nursing home administrators, which is responsible for licensing and certification; the Northfield police; the Rice County attorney; and the Northfield city attorney.  Vangsness Report at 7.

Vangsness's report was forwarded to the Minnesota Attorney General's Medicaid Fraud Control Unit, where it was reviewed by Investigator Susan Fortney Renstrom.  Renstrom decided to investigate further.  The Medicaid Fraud Control Unit is authorized to refer cases for criminal prosecution.  Renstrom reviewed the investigative reports and conducted her own interviews.

On February 23, 2004, after several months of investigation, Renstrom prepared a "probable cause statement" supporting a criminal complaint against plaintiff. Declaration of Susan Fortney Renstrom ["Renstrom Decl."] ¶ 3, Ex. A ["Renstrom Report"].  An

assistant attorney general concurred, and the criminal complaint was presented to, and signed by, a Rice County District Judge. The complaint charged plaintiff with one count of Criminal Sexual Conduct in the Third Degree, and two counts of Criminal Sexual Conduct in the Fourth Degree. An arrest warrant was issued and executed. Plaintiff was taken into custody on February 23, 2004. The record does not reflect whether plaintiff was represented by counsel, or whether he petitioned for release or review of the probable cause determination while incarcerated.

Almost two months later, on April 19, 2004, Renstrom learned that a different nursing home had received a complaint of sexual misconduct. The perpetrator was a man, similar in appearance to plaintiff, who worked for the same temporary staffing agency, and had worked night shifts at Northfield Care during plaintiff's employment at the facility. Renstrom Decl. ¶¶ 4-5. Renstrom obtained records of the other incident, and arranged photo lineups of both men. On May 4, 2004, the lineups were shown to the Northfield Care resident, but she could not be sure which man had assaulted her. Plaintiff was released from jail that same day; two days later the state dismissed its criminal charges.

Plaintiff alleges that his "license" was revoked as a result of the criminal prosecution. Compl. ¶ 44. These allegations are not a model of clarity. Vangsness indicates plaintiff was notified of his right to contest her determination of maltreatment.

Vangsness Report at 7.  Renstrom's report reflects that in January, 2004, plaintiff asked the MDH to reconsider his termination from the nursing assistant registry.  According to Renstrom, plaintiff told the MDH he had been in Nigeria from June 17, 2003, to November 23, 2003, and did not realize he had been removed from the registry until his return.  Renstrom Report at 5.

Plaintiff further alleges that, when the criminal charges were dismissed in May, 2004, he "requested that his Nursing Assistant License be reinstated, but the Minnesota Department of Human Services Board of Nursing refused."  Pl. Mem. at 3.  As a result, he claims his "Nursing Assistant License was revoked for over two years for a crime that he did not commit," and that he "could not find employment for over two years" as a result.  Compl. ¶ 44.

Plaintiff seeks damages for his arrest, incarceration, disqualification from work, and wage loss, claiming violations of his constitutional rights and Minnesota law.[4]

II.  <u>Analysis</u>

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby,</u>

---

[4]Plaintiff has voluntarily dismissed, with prejudice, his claims of defamation and intentional infliction of emotional distress against Northfield Care Center, Turner, and Tromsness. [Docket Nos. 36, 37.]

Inc., 477 U.S. 242, 246 (1986).  The party opposing summary judgment may not rest upon the allegations in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial.  See Anderson, 477 U.S. at 248-49.

As already noted, plaintiff rests on the unverified allegations of his Amended Complaint.  Ordinarily, this would be grounds for summary judgment.  Id.  However, in the interest of giving plaintiff the benefit of all fact disputes and inferences, the Court accepts the allegations of the Amended Complaint except where directly contradicted by defendants' evidence.

A.  Constitutional Violations

Plaintiff invokes 42 U.S.C. § 1983, and claims Officer Bailey, Sergeant Nelson, and Special Investigator Vangsness, in their individual capacities, deprived him of his constitutional rights.[5] As plaintiff's claims against these defendants arise from similar conduct, the Court analyzes them together.

When considering any § 1983 action, a court must first identify the precise constitutional violation alleged.  Baker v. McCollan, 443 U.S. 137, 140 (1979).  Here, plaintiff claims the officers' and investigator's investigations violated his Fourteenth

---

[5]The Eleventh Amendment bars any dollar recovery in federal court against Ms. Vangsness, in her official capacity, and the Minnesota Department of Health.  See Kentucky v. Graham, 473 U.S. 159, 166, 169 (1985).

Amendment due process rights.[6]

Plaintiff believes he was a victim of mistaken identity. According to him, the defendant officers and investigator relied on a false identification obtained by suggestive procedures.  They then failed to either confirm the identification or acknowledge its unreliability.  Plaintiff further claims defendants failed to pursue leads which might have revealed the other suspect.  Here, he seizes on the resident's inability to recall whether her assailant had facial hair or an accent.  Plaintiff claims he had both, which should have led defendants to question her identification.  In essence, plaintiff claims defendants' flawed identification caused false criminal charges to be lodged against him, leading to his wrongful arrest and detention.  These claims fail.

As an initial matter, plaintiff has failed to establish causation.  He claims he was injured when wrongfully arrested, detained, and prosecuted, and when his "license" was "revoked." But the defendant officers and investigator did not arrest, detain, or prosecute him, nor were they directly involved in the decision to disqualify him from working with vulnerable adults.  Defendants are liable only if they caused the constitutional violation. Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007); Baker,

---

[6]Plaintiff's complaint alleges violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Compl. ¶ 51). In his opposition to defendants' motions, he addresses only the Fourteenth Amendment due process claims. (Pl. Mem. at 6-7).  As a result, the Court considers the remaining claims waived.

443 U.S. at 142; Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir. 1999) (per curiam).  Absent "specific facts of personal involvement in, or direct responsibility for" the actual constitutional deprivations of which he complains, plaintiff is unable to show these defendants violated his constitutional rights.  Clemmons, id.

Defendants have offered unrebutted evidence showing the prosecutor initiated criminal proceedings after months of independent investigation.  A prosecutor's decisions are entitled to a presumption of regularity.  Hartman v. Moore, 547 U.S. 250, 263 (2006).  Plaintiff offers no evidence to overcome that presumption.  The criminal complaint was approved by a prosecutor and presented to a judge who found probable cause.  It is well established that an independent finding of probable cause breaks any causal link between an investigation and criminal proceedings.  See Ames v. United States, 600 F.2d 183, 185 (8th Cir. 1979).

For this reason, too, defendants are entitled to summary judgment on plaintiff's constitutional claims.  This fact notwithstanding, the Court addresses plaintiff's constitutional argument in more detail.

Plaintiff claims denial of Fourteenth Amendment due process.  But the defendant officers and investigator completed their work well before plaintiff's charge and arrest.  Law enforcement conduct, prior to arrest, is not typically governed by the Fourteenth Amendment.  It typically falls under the Fourth

12

Amendment, which "provides an explicit textual source of constitutional protection." See Graham v. Connor, 490 U.S. 386, 395 (1989); see also Albright v. Oliver, 510 U.S. 266, 275 (1994) (plurality) (substantive due process not violated by claims arising out of pretrial detention).  The Court finds the Fourth Amendment applies to Bailey and Nelson; the Fourteenth Amendment arguably applies to Vangsness, who conducted a VARA civil investigation. The Court addresses each Amendment in turn.

As the Supreme Court has recognized, "[t]he Constitution does not guarantee that only the guilty will be arrested." Baker, 443 U.S. at 145.  Rather, the Fourth Amendment protects a person's right to be free from arrest absent probable cause.  See Hill v. Scott, 349 F.3d 1068, 1072 (8th Cir. 2003).  A witness's credible description of a suspect may provide probable cause for arrest. See Pace v. City of Des Moines, Iowa, 201 F.3d 1050, 1057 (8th Cir. 2000).  Probable cause is not vitiated simply because there are inconsistencies in the description or because suggestive identification procedures were used.  Id.; see also Brodnicki v. City of Omaha, Nebraska, 75 F.3d 1261, 1265 (8th Cir. 1996).  The Fourth Amendment requires only that reliance on a description is "not objectively unreasonable." Brodnicki, 75 F.3d at 1264. Reasonable mistakes in judgment, including mistaken identity, do not violate the Fourth Amendment.  See Hill, 349 F.3d at 1073.

Here, the resident repeatedly offered plaintiff's name, with

no evidence of prompting by defendants.  She gave defendants a physical description which approximated the plaintiff -- a short black man wearing a white jacket -- and other consistent details leading to him (for example, that her assailant had six children and had recently attended a co-worker's baby shower).  Nursing home staff regarded the victim as "mentally sharp," and told defendants -- incorrectly, as it turned out -- that plaintiff was the only employee matching her description.  The resident claimed the assaults occurred on Sunday nights, when plaintiff was assigned to duty on the resident's unit.  And according to all the evidence before the Court, the other night employee, whose identification led to the plaintiff's release, actually resembled the plaintiff.

It bears repeating that Bailey and Nelson did not find probable cause and were not involved in the decisions to charge and arrest plaintiff.  An independent prosecutor and judge made those decisions.  However, even if Bailey and Nelson had been the ones to arrest plaintiff, the Court finds the Fourth Amendment would have been satisfied.  Mistaken identification, standing alone, does not rise to the level of a Fourth Amendment violation.  See Brodnicki, 75 F.3d at 1265.

Similarly, even if Vangsness had been involved with plaintiff's arrest and detention, plaintiff has failed to establish a due process violation.  In the context of a criminal prosecution, the Fourteenth Amendment's due process clause guarantees procedural

14

consistency and a fair trial.  See Brady v. Maryland, 373 U.S. 83, 87 (1963) (discussing right to exculpatory evidence in terms of providing a fair trial).   Once the Fourteenth Amendment's guarantees are recognized, they expose a flaw in plaintiff's argument:  he did not go to trial.

There is no freestanding constitutional right to be free from unduly suggestive identification procedures.  See Pace, 201 F.3d at 1055; Manson v. Brathwaite, 432 U.S. 98, 113 n. 13 (1977) ("unlike a warrantless search, a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest").   And the mere existence of exculpatory evidence does not violate the Fourteenth Amendment.  A prosecutor's intentional withholding of such evidence at trial rises to the level of a constitutional violation.  See Brady, id.  But the simple existence of exculpatory evidence does not violate the constitution.

Only a violation of the "core right" to a fair trial is actionable under § 1983, Pace, id., and plaintiff must show prejudice.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Absent a trial, there is no prejudice, and no due process violation.  See Becker v. Kroll, 494 F.3d 904, 924 (10th Cir. 2007).  The Court cannot doubt that an erroneous charge and detention are excruciatingly painful, but plaintiff was exonerated and released as soon as it was discovered that the charges against

him could not be proven.  While he had to endure a criminal charge, that burden does not violate the constitution.

There is no evidence showing the officers and investigator engaged in anything but regular investigative work.  Plaintiff has not shown they knew or believed they were building a case against an innocent man.  Ultimately, there is a total lack of any bad faith, as required for a procedural due process violation. Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004).  There is no showing whatsoever of behavior which shocks the conscience, as required for a substantive due process violation.  See Clemmons, 477 F.3d at 965.

Negligent conduct -- even grossly negligent conduct -- does not violate due process.  See Clemmons, 477 F.3d at 966; Daniels v. Williams, 474 U.S. 327, 328 (1986); Wilson v. Lawrence County, Missouri, 260 F.3d 946, 955 (8th Cir. 2001).  While not every interview was totally consistent, the resident's multiple interviews did not reveal her statements to be so entirely unreliable that defendants' reliance upon them would violate due process.  See Brockinton v. City of Sherwood, Arkansas, 503 F.3d 667, 672 (8th Cir. 2007).

Finally, plaintiff argues that defendants' conduct deprived him of two years' livelihood.  Although such a deprivation is arguably protected by the Fourteenth Amendment, plaintiff's claim fails for want of causation.

16

Plaintiff has not identified what "license" he held, and which entity "revoked" it, when, and for what reasons.   In Minnesota, nursing assistants are not licensed.   Minn. Stat. § 148.171 subd. 12; In re Disqualification of Johnson, 2006 WL 1229557, *1 (Minn. Ct. App., May 9, 2006).   It appears from the record, and the Court will assume for purposes of this motion, that plaintiff was a registered nursing assistant.   See Minn. Stat. § 144A.61; Renstrom Report at 5.   If so, the Department of Human Services would have made a determination to disqualify him from working with vulnerable adults, based in part on Vangsness's final determination of maltreatment.   Minn. Stat. §§ 626.557 subd. 9c, 245C.08 subd. 1.

A person accused of maltreatment must be notified so they can request reconsideration and a hearing to challenge the maltreatment determination.   See Minn. Stat. §§ 626.557 subds. 9c, 9d.[7] Although it does not address plaintiff's allegations concerning his disqualification, the MDH has produced evidence showing it notified plaintiff of his right to participate in its investigation and challenge the September 8, 2003, maltreatment finding.   Plaintiff does not allege that he challenged the MDH finding -- although it

---

[7]A registered nursing aide is afforded an opportunity to be heard prior to disqualification, and may seek judicial review of the Commissioner's finding.   See, e.g., Minn. Stat. § 256.045; In re Appeal of Staley, 730 N.W.2d 289, 296 (Minn. Ct. App. 2007); Findings of Abuse by D.F.C. v. Minnesota Commissioner of Health, 2008 WL 125238, *4 (Minn. Ct. App., Jan. 15, 2008) (reversing finding of maltreatment where victim unable to positively identify which of two similar-looking aides had been involved).

appears he may have done so belatedly -- and does not allege how the finding was connected to his eventual unemployment.  He does not allege the officer/investigator defendants were personally involved in any official decision to disqualify him from working.

The Court finds plaintiff cannot establish he was deprived of due process.  Under VARA, the decision to disqualify plaintiff from working with vulnerable adults is made independently by the Department of Human Services, which is not named as a defendant.  Minn. Stat. §§ 626.557 subds. 9c, 9d; 245C.14.  VARA and state licensing statutes provide extensive procedural safeguards with respect to disqualification, including notice and an opportunity to be heard.  See, e.g., Minn. Stat. §§ 626.557 subd. 9d; 245A.04; 245A.07; 245C.14; 245C.15; see also Staley, 730 N.W.2d at 292-93.  Ultimately, plaintiff cannot show either that defendants directly caused his loss of employment, or that it resulted from a denial of due process.

Absent a constitutional violation, defendants Bailey, Nelson and Vangsness are entitled to summary judgment on the merits, and are also afforded qualified immunity.  Pace, 201 F.3d at 1055.  Further, absent any colorable claim of a constitutional injury, plaintiff's conspiracy claims and Monell claims also fail.  See Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999); Abbott v. City of Crocker, Missouri, 30 F.3d 994, 998 (8th Cir. 1994).

18

B.   <u>State Law Claims</u>

1. <u>Officer/Investigator, Municipality</u>

Plaintiff alleges various state law claims, including negligence, false arrest, malicious prosecution, abuse of process, defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Plaintiff's state law claims against Vangsness in her official capacity and against the MDH are not cognizable in this Court.  <u>O'Connor v. Jones</u>, 946 F.2d 1395, 1397-98 (8th Cir. 1991); <u>Treleven v. Univ. of Minnesota</u>, 73 F.3d 816, 819 (8th Cir. 1996).

Beyond this, the Court finds Vangsness, Bailey and Nelson are entitled to official immunity.  A public official, charged by law with duties calling for the exercise of judgment or discretion, is entitled to official immunity, unless guilty of a willful or malicious wrong.  <u>Elwood v. County of Rice</u>, 423 N.W.2d 671, 677 (Minn. 1988).  Plaintiff does not deny that the duties of Bailey, Nelson, and Vangsness involve judgment and discretion; rather, he argues there are questions of fact which demand a trial on the merits to determine whether their acts were willful or malicious.  Pl. Mem. at 9.  Plaintiff is incorrect.

To defeat official immunity at the summary judgment stage, plaintiff must produce evidence showing defendants intentionally did a wrongful act without legal justification or excuse, or willfully violated a known right.  <u>See</u> <u>Anderson v. Anoka Hennepin</u>

19

Indep. Sch. Dist. 11, 678 N.W.2d 651, 662 (Minn. 2004); Nelson v. County of Wright, 162 F.3d 986, 991 (8th Cir. 1998). Plaintiff has introduced no such evidence. Absent evidence from which a reasonable jury could find defendants' acts are malicious or willful, the Court must afford Bailey, Nelson, and Vangsness official immunity. As Bailey and Nelson are entitled to official immunity, the City of Northfield receives vicarious official immunity. Anderson, 678 N.W.2d at 664.

2. <u>Northfield Care and Employees</u>

Plaintiff's claims against Northfield Care and its employees fail. They are sheltered under the immunity conferred by VARA and Minnesota's worker's compensation law.

Under VARA, one "who makes a good faith report is immune from any civil . . . liability that might otherwise result from making the report, or from participating in the investigation." Minn. Stat. § 626.557 subd. 5(a). Plaintiff acknowledges the victim is a vulnerable adult, and immunity is available to those who report maltreatment in good faith. He argues, however, that the report was not made in good faith, because it concluded he was the "perpetrator of the crime," despite the fact that he did not match the victim's description. Pl. Mem. at 15.

He is mistaken. Ms. Turner's report does not record Northfield Care's or its employees' conclusions; it simply records the resident's recollections. These include her responses to

questions, including her spontaneous statement that "Charles" was the assailant.  When Turner followed up, asking, "It was Charles?" the resident answered "Yes."  Turner Report at 4.  Turner merely recorded the resident's recollections.  There is no evidence suggesting she added anything or made independent conclusions. VARA compelled these defendants to investigate a complaint of vulnerable adult maltreatment, and report "all the circumstances" known to them when the report was made.  Minn. Stat. § 626.5572 subds. 2, 18.  Under these circumstances, they were legally required to submit the report, including the resident's recollections which pointed to plaintiff.

To the extent Ms. Turner and Ms. Tromsness may be considered plaintiff's co-employees,[8] his claims against them are barred by Minnesota's Worker's Compensation Law, unless the co-employees owe plaintiff a personal duty and are guilty of gross negligence. Minn. Stat. §§ 176.031; 176.061 subd. 5(c); Stringer v. Minnesota Vikings Football Club, LLC, 705 N.W.2d 746, 754-55 (Minn. 2005). The existence of a duty is a question of law.  Stringer, 705 N.W.2d at 755.  A co-employee's "general administrative responsibility for some function of employment" does not give rise to a personal duty to other employees.  Id. at 756.

Here, Turner and Tromsness performed their job duties and

---

[8]Plaintiff was employed by a temporary staffing agency and no longer working at Northfield Care at the time of defendants' conduct.

fulfilled their VARA obligations when they looked into the resident's report of abuse.   These are general administrative responsibilities, not personal duties owed to plaintiff.   As such, plaintiff's claims are barred by the worker's compensation law.

The Northfield Care Center, Turner, and Tromsness are entitled to summary judgment on plaintiff's claims of negligence and negligent infliction of emotional distress.

III.   Conclusion

For the foregoing reasons, defendants are entitled to summary judgment on all claims.

Accordingly, IT IS ORDERED that:

(1) The motion of Northfield Care Center, Sara Tromsness and Karen Turner [Docket No. 31] is granted.

(2) The motion of the MDH and Debora Vangsness [Docket No. 34] is granted.

(3) The motion of the City of Northfield, Gary G. Smith, Rich Bailey and Monte Nelson [Docket No. 38] is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 31, 2008

s/ JAMES M. ROSENBAUM
JAMES M. ROSENBAUM
United States Chief District Judge